N.T.-0186 Linden Big Rock, Linden, McKellips and Linden and Sons Sewer, Water, and Water at Appel, Phoenix, Appelese. Arguing on behalf of Linden, McKellips, John R. Zemek, our memorial macabre for Phoenix, Appelese, and Daniel Pinuska. Also arguing on behalf of Phoenix, Appelese, and Cornelius F. Brewer. Gentlemen, are you ready to proceed? Yes. And you two have resolved the amount of time you will allocate? Yes, we have. Okay, fair enough. Proceed when you're ready then, Counselor. Thank you. May it please the Court. Again, my name is John Zemenak with the law firm Rapp, G. & Woodward, representing the plaintiff, Appellant. In 1981, in an opinion decided by Illinois Supreme Court Justice Thunderwood, he pronounced the following, discovery is intended to be a mechanism for ascertainment of the truth. Here, the plaintiff did not have an opportunity to ascertain the truth for the benefit of the trial court because the trial court ruled prior to allowing any discovery by the parties to flush out the necessary facts and disputes in this case. So your opinion would be, even though it's a statutory statute of limitations issue, further discovery was necessary to flush out what factors are you alluding to? Absolutely. All the cases that we rely on and, in fact, that defendants rely on state that the issues in the defense to a statute of limitations defense are factual issues which have to be determined by the prior effect. So what, in your opinion, I mean, the trial court concluded, did it not, that the village knew or reasonably should have known that it was injured and the injury wrongfully caused. The damage is no later than October 21, 2013, the date on which the village sent a notice to Linden, declaring it in default under the contract and demanding identification of all failures, repairs, and threatening termination of the contract in litigation. So how would one not read that at that point they knew that these problems existed? Great question. And there is this defense to the statute of limitations argument called estoppel or equitable estoppel. And courts have applied that on numerous occasions to bar a statute of limitations defense. And I think that's really the crux of the issue in this dispute is how the trial court applied the issue of estoppel in this case. And we believe they misapplied the law by relying on the case Vaughn v. Speaker. And I'd like to go into that briefly because Vaughn v. Speaker was decided in 1989 by the Illinois Supreme Court  and Vaughn v. Speaker relied on a 1928 Illinois Supreme Court case which applied estoppel to a statute of frauds defense and it held that there has to be a misrepresentation or a concealment by the defendant for estoppel to apply. I was about to ask you that. So how did that exist here? Where's the concealment? Well, that's the great question because after Vaughn v. Speaker was decided in 1989, the majority of Illinois cases which have applied estoppel don't even use the Vaughn v. Speaker standards. They use the prior standards announced in the Illinois Supreme Court in the case Witherall v. Weimer. And the Illinois Supreme Court ruled in the Jackson-Jordan Inc. case in 1994. Again, five years after Vaughn v. Speaker was announced that it's not necessary to allege misrepresentation or concealment. There just has to be some conduct by the defendant that the plaintiff reasonably relies on in order to extend the statute of limitations. And that conduct would have been what here? Well, here there were numerous instances of conduct that we lay out in our complaint and in some of the materials we submitted. First of all, Linden came in after the notice of default was sent. Linden immediately sat down and started negotiating with the plaintiff about repairs, the scope of repairs, and how they would be done. Linden, in fact, made repairs. This is a wastewater treatment system. There were 189 tanks on 189 different properties. Linden came in and repaired 189 of the service risers on these tanks on 189 different properties in an acknowledgment of fault and its need to remedy these defects. There were two service risers coming up from these tanks out of the ground. So Linden repaired 189 of one type of service riser. As to the other type of service riser, we allege this repeatedly that Linden contacted the manufacturer, found out how to solve that problem of the leaking riser, ordered a probe grouter, a special tool to make repairs, ordered materials to make the repairs, and led the village, the plaintiff, to believe that it would make repairs to these other risers. So after the default letter was sent in 2013, we had meetings and repairs started in 2014. These comprehensive... Counsel, let me ask you. Yes. Given that there's this 4-year statute of limitation, you've got to know that this clock is running. And so the concern that we see with this here is why did you wait 5 1⁄2 years after you discovered what you, the village called, is widespread system failures? Wouldn't it have been prudent to file by April of 2017? Yeah, and that's a great question, and the issue in this case, and here's why it wasn't required. Because when a party makes acknowledgment of fault and starts making repairs and furtherance of the contract, that extends the statute of limitation and gives us as the plaintiff a defense to having to rush in and file a lawsuit. And when the party is negotiating with you, and in this case actually negotiating a lump sum payment in acknowledgment of their responsibility and making repairs, Illinois case law has said that's enough to toll the statute of limitations. Or at the very least, it's enough to create a factual issue that this should be remanded for discovery so we can flush these issues out. Is there any case law that you have that says the dependency of good faith negotiation is sufficient for estoppel? Negotiations in and of themselves is not enough for estoppel, at least according to one case. But there are cases we cite, and I can list them for you, that state that when it's unclear exactly what is necessary to cure defects, and when steps are taken by the allegedly at-fault party to cure those defects, coupled with negotiations, that course of conduct taken together can be enough to toll the statute of limitations. Well, let's consider this from a certainty in the law standpoint. I mean, obviously one of the purposes of statutes is to provide some certainty in the law. So as I'm listening to your argument, it would almost have a chilling effect, wouldn't it, on negotiations and attempts to mediate the situation? Because then, if I'm the company, if I'm Linden, I'm thinking, well, I'm not going to do anything because the statute's going to go on indefinitely. So you're causing maybe the contractor to say, okay, I'm not going to do any negotiations. You've got four years to file your lawsuit. I mean, it's sort of a slippery slope, isn't it, as to how much negotiations are going to work against you? I agree. It's very fact-specific and determinative. So in the case of, I think it's the Senior Housing Inc. case, the first district case from 1989, I think negotiations went on and attempted repairs for eight years before the lawsuit was filed. Yeah, but even if the negotiations that was going on between the parties into 2016, we have correspondence that indicates that negotiation completely broke down by the fall of 2015. So wasn't that ample time still, even after the negotiation completely broke down, for the village to file the lawsuit? So let's say negotiations completely broke down in 2015 and that repairs, as we allege, repairs and efforts at making repairs ceased in 2015. That's when the clock starts. That's what the case law says. We filed this lawsuit in 2018, within four years after negotiations broke down, discussions of a lump sum payment stopped, and repairs, good faith efforts at repairs stopped. Now again, we don't have to allege a stop hold, or we don't have to allege the discovery rule in our complaint. That's not a requirement under Illinois law. We just lay out the facts of default breach damages. Once a defendant raises the statute of limitation defense, then it becomes a factual inquiry whether there's any justification for pulling the statute of limitations due to a stop hold, discovery rule, et cetera. And here we believe that the trial court simply ruled, again, in misconstruing some of the facts in this case, which I can get to if you like, that I've got enough facts, I'm ruling as a matter of law. We think that's inappropriate. And so many of these cases, even the very case that the judge relies on, which is the Knox College case, in that case, the judge remanded the matter, the appellate court remanded the matter, I'm sorry, that's a Supreme Court case, remanded it to the trial court for determination of the essential facts. So essentially that's what you're asking for. It is. And I can point out instances where the trial court's statement of facts, alleged understanding of the facts, is incorrect. For example, it's stated that by October 21st, 2013, the plaintiff knew that Linden had performed some warranty repairs but would not conduct full inspections or excavations or fraud-based job-wide repairs or replacements of all risers or electrical boxes. A statement like that is wrong in many respects because the repairs didn't even start until 2014 and were finished in 2015. In 2015, other repairs were being negotiated as well as a lump sum payment. The electrical box issue, which was a latent, buried defect, wasn't even discovered by the plaintiff until 2016. Now, in this case, the defendants, they disputed liability, though, didn't they? They did, through the attorney, yeah. They pointed to the manufacturer as being the cause for the leaking risers, which is one part of the defect. I'm looking at this case, Lombard Company v. Chicago Housing, I'm sorry, you're aware of that? Yes. One of the grounds that the law court there found the equitable stoppables was that the contractor there had never disputed liability. Correct. But that's different than our case, right? Well, yes and no. What's interesting here is you've got this juxtaposition between the posturing of the lawyers and the lawyer for the general contractor, Linden, saying, we're not at fault, we're not at fault. But what's actually happening, aside from the lawyers' letters, is that Linden is acknowledging fault by making repairs to 189 of these risers and ordering the specialized tool and materials to make repairs to 189 of the other risers. Let me ask you, is the trial court ruled that the statute ran out on what date? At the latest, 4 years after the October 21, 2013, letter from the village was written. So sometime in October 2017? Correct. Were there any negotiations for repairs ongoing after that date? After 2017? No. We terminated the contract. The plaintiff terminated the contract by letter in 2016 because at that point, repair efforts ceased and negotiations had ceased. I'm sorry, everything stops in 2016? Yes. Other than us employing the manufacturer to make repairs that Linden had promised to do and had ordered, again, a specialized tool. But it was pretty apparent by 2016 none of these defendants were going to fix this. Correct. Another point, this is an underground system involving a small village. And when there were widespread system failures, meaning groundwater is getting into this system, which shouldn't be happening, and the village put the parties on notice, there were widespread system failures. The village didn't know exactly the full nature and extent of the problems because they were buried underground. There wasn't a full investigation by the parties and the village was unable to determine causation or fault right away. Now, under the contract, before the contract can be terminated, and what the plaintiff reasonably believed was a requirement to initiating a lawsuit, we had to first send out a notice of default and provide the general contractor with seven days to cure the default. And if they failed to do so, then we could terminate the contract. So that's what the village did. They sent out in 2013 a notice of default identifying what it believes, even though there's no thorough investigation done, were problems with the system and demanding it fixed within seven days. And so what happened? Linden ran in, negotiated with the plaintiff, started making repairs, promised to make other repairs, and that basically stopped the plaintiff. The plaintiff relied on that and did not terminate the contract. It waited until the negotiations. How does terminating the contract help you at all? The work was completed at that point. The only thing you were addressing by terminating the contract was the warranty. The one-year guarantee period, which says you have to make repairs that are discovered within the one-year guarantee period. And we believe that I think it's a reasonable reading of the contract that when you say there are defaults, when there's defects that are discovered within the one-year guarantee period, we have to put you on notice and give you an opportunity to cure those before we can terminate the contract. Otherwise, the defendant Linden would be running in and saying, you just filed a suit. You never put us on notice. You never gave us an opportunity to cure within seven days or a longer time period. And this lawsuit is premature. And that's what we are protecting against. Counsel, you'll have a chance for a reply. Do you wish to respond? Good morning, Your Honors. Good morning. May it please the Court. Okay, well, I'm going to approach this appeal, I think, perhaps a little bit differently than the co-defendant. But essentially, there's not that many issues against applied technologies in this case. Okay? Plaintiff has not raised anything about equitable tolling or contractual tolling or repair doctrine tolling. None of that is against— By the way, could you identify yourself for the record? Oh, sorry. Daniel Hanuska for applied technologies. Okay. So none of that's raised against applied technologies. There's just a very narrow, limited discovery rule argument against applied technologies. And even that is limited because plaintiff does not challenge that the statute of limitation bars the 2013 riser defects. So the riser defects related to the 12-inch and 24-inch risers, the bad epoxy work that was done on the risers, the improper sealing of the waterproofing of the risers to the tanks, none of that is being argued. So plaintiff's limited discovery rule argument is very narrow, and basically it's only saying this, that post-2013 barrier defects should be tolled under the discovery rule all the way to 2016. And that's a very problematic proposition, I think for very obvious reasons, because essentially by doing that, by tolling the statute of limitations for these post-2013 defects, it's basically assigning a statute of limitations timer, you can say, to each and every subsequently discovered defect. And so that would basically violate the entire point of the statute of limitations for construction. It would create indefinite liability. There would be a lot of uncertainty in the business. So that's the problem with ignoring what plaintiff knew about in 2013 for the benefit of what it later found out that was barrier defects. But also that argument goes against the weight of the case. And really that argument was tried already in the second district. The same discovery rule argument that plaintiff's now bringing to this Court has been tried in this district already, and it was rejected. So in a sense, this is part two. It's a sequel. And the first case that was dealt with is called the Freeport case. And I cite that on page 20 of my brief. But before I get into the Freeport case, I do want to make this point in the limited time that I have. I don't think the Court even has to address the discovery rule argument as to applied technologies, because I think, and I don't think this is a pity point, I think it's a very important point, that there's substantial noncompliance with Supreme Court Rule 341H7. Okay? And 341H7 governs, you know, gives us the recipe, in a sense, of what's supposed to be an appellate argument. Right? You have to cite the record, you have to cite some case law, and you have to make an analysis of all of it, bringing it all together. Right? And the simple point I just want to make as to the 341H7 requirements is this, that this Court has within its power to deem forfeit the argument of plaintiff. I think it has enough to deem forfeit the argument of plaintiff to everything, but certainly as to applied technologies. Because when the consequences of noncompliance with 341H7 cause difficulty, hindrance in reviewing the record, I know there were some problems for applied technologies in knowing what was argued against it, because there was nothing argued against it. There was no case law, there was no citation for the record. Although you're aware of the fact that forfeiture is a limitation on the parties, not the Court. We could ignore that argument. Absolutely. Absolutely. I'm just letting the Court know that because it created these difficulties, it's an option for the Court. Let me ask you this. Obviously at some point, I believe probably within a day or two of the alleged defects, ATI and Linden sent our representatives to inspect the sewer system and all the failures, right? Right. So did ATI then engage in the so-called negotiations for a while with the villager? What happened? What was ATI's role? My understanding from the record is that ATI kept its distance. It didn't engage in any repair participation. I think it did the initial inspection. But that was it? That was it. That's my understanding, yes. And that brings up a good point, though, with the Freeport case. So the second district case, Freeport, right, was confronted with the same discovery rule argument that plaintiffs now bring in, that there was two inspections in the Freeport case, okay? The first inspection did not uncover all the defects to the construction project. And so in the Freeport case, there was an addition built to a hospital, and there was leakage, there was brick crack going down, et cetera. And the first inspection that was done for the plaintiffs in Freeport did not uncover the full extent of the damage. The inspectors could not get past this. It wasn't really a brick wall. It was like a brick, a brick, okay, just a brick structure, I guess almost like a brick wall. They couldn't get behind it to see where the leakage was coming from and the defects. And the defendants in the Freeport case gave a letter to the plaintiffs saying, this is what we think the problem is. We advise that you get a second inspection because we can't find out the full extent of your damage. We can't get behind that brick wall, that bricked-off portion of the addition. And so Freeport, the plaintiffs in Freeport, waited two years to get the second inspection. After that second inspection, they did hire a masonry contractor that was able to get behind that brick wall to find out where the leaking was coming from, the full extent of the damages.